# **EXHIBIT 1**

SHERIFF'S ENTRY OF SERVICE                    SC-85-2

Civil Action No. _____

Date Filed _____

| | Superior Court | ☐ | Magistrate Court | ☐ |
|---|---|---|---|---|
| | State Court | ☐ | Probate Court | ☐ |
| | Juvenile Court | ☐ | | |

Georgia, _____ COUNTY

Attorney's Address _____

_____ Plaintiff

VS.

Name and Address of Party to be Served.

_____

_____ Defendant

_____

_____ Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐ I have this day served the defendant_____ personally with a copy of the within action and summons.

**NOTORIOUS** ☐ I have this day served the defendant_____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows: age, about _____ years; weight _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION** ☐ Served the defendant _____ a corporation by leaving a copy of the within action and summons with _____ in charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL** ☐ I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐ Diligent search made and defendant_____ not to be found in the jurisdiction of this Court.

This _____ day of _____, 20 _____

_____

**DEPUTY**

SHERIFF DOCKET_____ PAGE_____

ID# 2021-0007053-CV
⚡ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

21100427

Kimberly A. Childs - 58
JAN 19, 2021 12:20 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY

Karen Gitau:
C/o P.O. Box 9301
Marietta Ga 30065

> Plaintiff,

vs.

Little River Capital / Artisan Built Communities:
76 Seven Hills Blvd, Suite 109
Dallas Ga 30132

> Defendant

## RACIAL DISCRIMINATION, WORKPLACE HARASSMENT & RETALIATION LAWSUIT

The Plaintiff, Karen Gitau, sues the defendants Little River Capital (discoverartisan.com). In support, plaintiff states as follows:

1. This racial and discrimination action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended. The jurisdiction of this Court is invoked by the plaintiffs pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202. This lawsuit is brought pursuant to the "The Civil Rights Act of 1866," 42 U.S.C. § 1981, and 1981a and The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991. Equitable and other relief is sought under 42 U.S.C. 2000e-5(g).

2. Plaintiff is an African American citizen of the United States and a resident of the state of Georgia. Plaintiff was employed with Little River Capital as a Senior Accountant between 05/15/2017 to 11/14/2019. On March 10, 2020, a Charge of Discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") alleging Racial Discrimination, Harassment and Workplace Retaliation. On November 6, 2020 a Notice of Right to Sue letter was issued by the EEOC, a copy of which is attached hereto as **Exhibit "A"**.

3. During her two and a half years tenure at Little River Capital, the Defendants created an environment which encouraged and fostered a

hostile work environment for Ms. Gitau due to her race. Such conduct was ongoing, open, and notorious. Simply put, Racial Discrimination, Harassment and Workplace Retaliation is deeply embedded in Little River Capital; and was directed on to Ms. Gitau who was the only African American in the office. The harassment, abuse and discrimination were encouraged by whirlpool management's refusal to stop the misbehavior. Several text messages from 69% of the co-workers confirming that this behavior constantly occurred are demonstrated as Exhibit "B".

4. Being the only African American at Little River Capital, Ms. Gitau was subjected to a stricter level of scrutiny than any similarly situated white co-workers. As an African American, she was repeatedly reprimanded and disciplined for relatively minor mistakes. The same behavior from similarly situated white employees was largely ignored even when discovered. Several text messages from co-workers confirming that this behavior constantly occurred are attached as Exhibit "B".

5. Exhibit C: This demonstrates that Little River Capital attempted to collect Insurance premiums from the Plaintiff after she had been terminated from the company. Little River Capital failed to cancel the insurance premiums that they had on Plaintiff and therefore felt she was obligated to pay for it. Keep in mind, Little River Capital paid 100% of its employee's insurance coverage – therefore, it was not a deduction on their payroll. This is a form of an unorthodox scare tactic as well as an illegal harassment by the Management which consist of Mr. Haines (President) and Mr. Stevenson (Owner). Exhibit C provides two copies of the Premiums sent to the Plaintiff's home demanding payment. The Premium notices are dated 11/25/2020 and 12/02/2019. The Plaintiff was terminated on 11/15/2019.

6. The Back-Pay shown below is an actual representation of increase in Salary for employees holding difference ranks within the company. All the ranks except for the Controller's are below the Plaintiff's level and as demonstrated below, the employees were paid more than double and some triple of what the Plaintiff received. A clear example is the earning of the Accounts Payable Clerk $256.17 vs Senior Accountant $76.08 (Plaintiff). The handwriting below is from the Company. Let it be noted that they are not refuting the claim but wondering how the Plaintiff

discovered the truth. The Plaintiff rejected her 1% annual pay raise and the hardscrabble back pay that reflected the raise of $76.08 and was released from the Company 3 days later.

Below is a breakdown of back-pay increases for most of the employees in comparison to what I rejected.
Raul Lugo $160.50 - Crew
Shirley Hovey $279.57 - Purchasing Assistant
Vernon Bracken $458.61 - Controller
Jennifer Slayton $256.17 - Accounts Payable clerk
Frances Gravesen $131.93 - Receptionist
Brandon Howard $289.18 - Superintendent
Bradley Butler $293.08 - Superintendent
Alie Voyles $192.11 - Closing Coordinator
Karen Gitau $76.08 - Senior Accountant



7. **Exhibit D:** This is a Declaration by the President, Stephen Haines presenting how incompetent the Plaintiff was at with her work. Let it be noted that Mr. Stephen Haines later fired the Controller, Mr. Richard Bracken on 6/18/2020 for the same reason: Job Incompetency. For this, Stephen Haines Declaration now demonstrates that the Plaintiff was speaking the truth; and he failed as the President of the Company because he tried to cover up what was already known by the Owner of the Company based on the past other two African American women who held the Senior Accountant position prior to the Plaintiff.

In President, Stephen Haines' Declaration, he mentioned that the Plaintiff complained about other employees. During the only two meetings that were held between the Mr. Haines and Ms. Gitau, he acknowledged that the Receptionist was constantly online shopping. The receptionist's computer screen faced the conference room and therefore anyone would have a full view of what was on the screen. Mr. Haines continued to state that during several of his meetings with other employees of the company, the receptionist was always on personal sites browsing clothes or household items.

Mr. Stephen Haines also acknowledged that the Accounts Payable Clerk, whom he shared an office with, would be watching movies; taking several personal calls outside of the building and thus leading to a backlog in work.

Mr. Stephen Haines would present out-of-job description tasks to the Plaintiff which expectedly would result to failure. One such assignment was to broaden the internet bandwidth in the premises. When the Plaintiff, who was a Senior Accountant, brought in Comcast and they did

not resolve the problem. The President yelled at the Plaintiff from across the hall, for all staff members to hear him belittling her about her inability to get hot spots in the building. The Comcast contractor had to step in and explain to the President that the devices were mainly used in residences and not commercial accounts. After the Comcast contractor left, Mr. Haines continued to demand that she finds a way to ensure internet works within the office premises.

This demonstrated nothing more than Mr. Stephen Haines discombobulating the Plaintiff and doing what it takes to keep his new job. This is a clear example of what is outlined in the Black Lives Matter movement – where racism and inequality was clearly demonstrated in this workplace. This is where the only Black person – Black woman faced obstacles from every direction while the rest of the Caucasian employees sat and watched. This is a workplace whereby the Plaintiff – the only Black person/Black woman in the workplace, was tormented for spending her weekend (unearned pay) to draft a Company Handbook. A 43-page Handbook which the Controller, Richard Bracken, took from her and threw in the garbage can. Why? Because he was upset with Page 9 which outlined Harassment and Retaliation in the Workplace.

The Plaintiff was treated as an add-on, not as an essential element of the organization yet they pushed more and more work on her only to give her 2% raise in the first year and 1% raise in the second one.

The President, Mr. Stephen Haines took the detailed situations presented by the Plaintiff and just simply scoffed them off. He refused to examine how the Plaintiff felt or perceived those prejudices. He refused to investigate the common occurrences that happened to a total of 3 African American women, who were also represented the ONLY women who held the same position and reported to the same person. Instead, he was quick to blame the African American women – why? Because they are BLACK.

As stated above, the Receptionist whom he acknowledged constantly browsed shopping websites during company time or the Accounts Payable Clerk who watched movies at work while her work fell behind and the company continued to receive late payment notices. These positions were held by Caucasian women. These employees never had their work stepped on; work sat on; or called "Brainless"; who referred to a "Ho" or subjected to anything like what the Plaintiff horrifically experienced. As a matter of fact, the Receptionist whom the Mr. Haines

constantly complained about was then promoted to Director of First Impressions within the company.

When Mr. Haines was hired in mid-2019; one of his first tasks was to meet with each employee to discuss their tasks and get their viewpoints on how to streamline their tasks and for them to share their grievances. The Plaintiff thought that the company has finally hired someone who would fix the company; implement procedures that would ensure that everyone adhered to Company rules and regulations but what she received as a "Why are you still here". Even after the Plaintiff explained that she had moved a son to a school that was close to the workplace, the President turned a blind eye and worked towards silencing the Plaintiff. An African American woman, who put her child first; who painfully opened about her past child molestation; rape and domestic violence in hope that that the leadership in the company would start treating her like they did their Caucasian employees. All they did was shut her down and tell her not to discuss her past personal mishaps within the company. Leaves one to wonder what they would do if one of their children was treated the same way.

8. The previous two African American who held the position of Senior Accountant at Little River Capital / Artisan Built Communities:

**KIM HAROLD:** was the first Senior Accountant in the company. An African American woman who, per the Controller's words, helped design and streamline Little River Capital's Accounting functionalities to coincide with Jackson Healthcare (their Investor Company - 2655 Northwinds Pkwy, Alpharetta Ga 30009) accounting system.

Two weeks before Kim Harold was terminated, the Controller, Richard Bracken, had overdosed on his heart medication while in the office as he had unfortunately forgotten that he had already taken his required daily dose. Kim Harold, not only, immediately offered to rush him to the neared hospital but stayed at the hospital until he was cleared and then drove him home. When he returned to work, after a few days, he was evasive towards her and barely spoke to her, yet their job required constant interaction throughout the day. He started emailing her falsifying that she has failed to meet expectations on her work; and two weeks later, she was terminated.

The episode of the overdose is one that was witnessed by several employees who were in the office at the time.

A few months after her exit from the company, a transaction between the Owner of the Company, Mark Stevenson, and the former employee, Kim Harold occurred whereby she received several thousand dollars for "fertility treatment".

**TIFFANY WARREN:** was the 2nd Senior Accountant brought into the company. An African American woman. A few months before Tiffany Warren's tenure with the company was ended by the Controller, Ms. Gitau was hired as a Part-time Accounts Payable Clerk. She shared an office with Tiffany Warren; and during this time, she was witness to the harassment that the Controller, Richard Bracken brought onto the Senior Accountant. The last straw that led to the termination of Tiffany Warren was when she advised the Parent company, Jackson Healthcare (2655 Northwinds Pkwy, Alpharetta Ga 30009) of what was going on with Little River Capital's incorrect financial reporting. Minutes before Tiffany Warren was scheduled to be fired, Mr. Bracken informed Mr. Stevenson that the firing was about to take place and the latter quickly left the premises to avoid being part of it. This was a common practice of his whereby he ensured he was away when an employee was being let go from the company.

9. Little River Capital is liable under Title VII for such harassment and discrimination because it knew of the racial harassment and discrimination but failed to take prompt and effective remedial action. Instead, it did just the opposite. It condoned, ratified and otherwise allowed the racially harassing and discriminatory behavior to continue year after year. Although the plaintiff was not subjected to this, racial slurs were used during Ms. Gitau's tenure at Little River Capital. Ms. Gitau was, however, subjected to constant humiliation about having very bad breath. Ms. Gitau, during her initial interview, as well as on several occasions, thereafter, had explained that she suffered from a condition whereby the odor came from the blood via the lungs and into the breath. She has a blood-borne halitosis caused by a metabolic disorder. She would be laughed at her; mock about her "made up excuse for not brushing her teeth probably; and leave business cards from Family Dentistry at Seven Hills (76 Seven Hills Blvd, Suite 107, Dallas Ga 30132).

10. The Crown Act explicitly prohibits discrimination on the basis of hair texture or style, commonly experienced by Black Americans. Nobody should be harassed or discriminated against for wearing their natural hair or choosing a style based on cultural heritage and preferences, yet Ms. Gitau was faced this biased when the Controller and former Office Manager approached her thrice informing her they felt that her hairstyles might be going against workplace regulations. Ms. Gitau asked that they show her where this regulation is written.

11. There are countless examples of how Ms. Gitau was treated differently from the rest of her co-workers: from being asked why she wore jeans to work in the middle of the week yet on the same day the Sales Director, Cammy Luchina and Alie Voyles -- both Caucasian women also wore jeans to work. When Ms. Gitau asked both co-workers if they were approached about their dress code, they laughed it off saying that the Controller would not dare ask them about it. Ms. Gitau then inquired with the Controller why she was singled out and his vague response was: "The situation does not apply to them". The following day, Thursday, the Controller came to work in jeans.

12. As a result of the plaintiff's good faith complaints and opposition to Race Discrimination and Racial Harassment, the defendants retaliated against the plaintiff by subjecting her to stricter scrutiny than her co-workers, to demeaning and hostile treatment, to wholly unwarranted negative performance feedback, to being subjected to unwarranted discipline. The Plaintiff was fired 3 days after turning down a 1% annual pay raise while the rest of the company enjoyed 5% and above raises. This was the second consecutive year that this 1% pay raise occurred for the only African American woman in the Company. If this woman was so terrible in her duties, why was she assigned a Senior Accountant position after a few months of being the Accounts Payable Clerk. Why was she assigned to solely add on the fulltime Office Manager duties to her current duties with no pay raise?? This is the woman that the company belittled and demonstrated as the worst employee as noted in the Declaration submitted by the President of company. After she declined to accept the 1% pay raise, she was terminated. Why? They knew they were in the wrong and needed to get rid of her because they realized that she was no longer going to be silent about their Racist and Segregation Behaviors. The leaders of

the company knew about the Plaintiff's traumatic upbringing but yet continued to bring on their slave-like mentality on this woman – stepping on her paperwork; throwing her paperwork to the floor and watching her picking it up; referring to her as whore in slang terminology; hand drawn directions on paper that led to her house while they said that if any money goes missing from the company, they know where to find her. There is no comprehension to this inhumane and barbaric behavior which has led to the Plaintiff's severe depression and extreme anxiety. Mr. Stevenson and Mr. Haines knew that issues lay within the Controller but somehow it seems that they enjoyed a backseat to what transpired in the office place. This was prevalent in an instance whereby Ms. Gitau was tasked by the Mr. Stevenson to create a spreadsheet indicating all holidays for the year. When Ms. Gitau included Martin Luther King holiday, Mr. Stevenson scratched it off and said: "Not in my lifetime! Let the employees pick a floating day of their choice". What other explanation would it be but the only reason the Company only hired one Black person at a time was to meet their Affirmative Action as required by the U.S. Department of Labor Office of Federal Contract Compliance Programs.

WHEREFORE, Plaintiff, Ms. Gitau, respectfully requests that this Court enter judgment against the Defendant and provide the following relief:

a. Award actual damages, including appropriate amounts of back pay and front pay and the money lost

$12,363.63

b. Award compensatory for race discrimination, retaliatory discharge, wrongful termination, and hostile work environment

$489,535.85

c. Award costs and reasonable attorney

Included above.

d. Grant any and all appropriate relief, which the Court deems necessary and appropriate.

Plaintiff demands jury trial of all issues.

Plaintiff: _____
KAREN GITAU

**EXHIBIT A**



### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Atlanta District Office

100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
(404) 562-6855
TTY (404) 562-6801
FAX (404) 562-6909/6910

Karen Gitau
1920 Lakeshore Overlook Circle
Kennesaw, GA 30152

RE:     Gitau v. Little River Capital

Dear Ms. Gitau:

Thank you for your patience and cooperation during EEOC's administrative investigation of the above-noted charge. This letter will serve as an explanation concerning the Equal Employment Opportunity Commission's (EEOC) determination of the merits concerning the above-referenced charge of employment discrimination. The determination relies on the following information:

1.  On March 10, 2020, you filed a charge with the EEOC alleging that you were discriminated against based on your race (African-American), in violation of Title VII of the Civil Rights Act of 1964, as amended and in retaliation for opposing unlawful employment practices, in violation of (Title VI).

2.  Examination of the evidence reveals that the Respondent denies your allegations and contends that you were trained and re-retrained regarding performing the essential functions of your job, but failed to improve which subsequently led to you being discharged for poor job performance,

3.  We have reviewed the evidence you submitted and that submitted by the Respondent. At this time, there is insufficient evidence to show that the Respondent discriminated against you based on Title VII of the Civil Rights Act of 1964, as amended.

Therefore, EEOC has terminated its investigation of your charge. This practice is consistent with the Commission's Priority Charge Handling Procedures when the office has sufficient information from which to conclude that it is not likely that further investigation will result in a violation of the statutes we enforce. Enclosed please find your Dismissal and Notice of Rights and Information Sheet. If you wish to pursue your charge further, you have the right to sue the employer named in your charge in U.S. District Court within ninety (90) days from the date you receive the enclosed notice.

Thank you for your attention to this matter.

**November                                    6,                                    2020**

**Larry E. Satterwhite, Sr**

Date

Larry E. Satterwhite, Sr.

Investigator

**EXHIBIT B**

**Kim Harold** was the 1ˢᵗ Senior Accountant at Little River Capital.  She is an African American woman.   Below are text messages whereby she confirms the poisonous characteristic of the Controller and why the Owner of the Company continued to keep him on board.

# New Message

To: Kim Harold

No worries... I knew Mark would eventually. However, I think Richard knew too much about that "Fancy" accounting Mark does to let him go prematurely. I know there is some shady accounting going on there.

**New Message**                    Cancel

To  Kim Harold

Thu, Jul 9, 8:09 PM

That's interesting... Mark knows that they are negligent in having someone with Richard's character working for the company. Let me know if you need anything. Take Care!

**Tiffany Warren** was the 2nd Senior Accountant at Little River Capital – she was also an African American woman. Her account of what ocurred during her tenure is the clear example of the company turning her into an extremely angry Black woman.

New iMessage                    **New iMessage**          Cancel

Tiffany Warren                          Tiffany Warren

I never had that happen. IMO they          Yes, because somehow racist White
are only hiring Black women to be          people believe Asian people are the
scapegoats. Something is definitely        smartest on Earth.....
fishy about the business. There is
no way any real business man would
have such an idiot as his Controller.      
Think about what other Black
person works there? Why only the
one position, no other. Remember           That's just it believe Asians are
Delaney wasn't "Black" so she              smart Black people are stupid....it's
doesn't count. He has never hired a        a racist pattern woven in to the
Black man for obvious reasons. He          fabric of this country and many
has not hired any other minority.          others....
Each of us was made to look
incompetent and treated as
disposable property. I think Richard       However the truth is they are usually
hires Black women because he               just more disciplined. Is what I see
knows Mark would never believe us          in America. Except Richard he can't
over him. However, Mark sees it he         even count properly. What type of
just doesn't care. He knew it was          mess is that?
wrong...that's why he didn't have
the balls to be there for our
termination. He hauled ass out of

This Text demonstrates that the company hired its 4th African American woman to work under the Controller, Richard Bracken. This demonstrates a pattern which involves not only the Controller but the Owner of the Company, Mark Stevenson and the President, Stephen Haines.

**New iMessage**

Tiffany Warren

**Your replacement came into the
office today......drum roll
please....She's Black.....why are they
continuously hiring Black women?
Are they getting off on abusing us?
I wish I could warn her.....**

These text messages are from the Accounts Payable Clerk, **Jennifer Slayton** which demonstrates that more employees knew what was going on in the company.  This demonstrates that the Accounts Payable Clerk was fully aware of the incompetence of the Controller, Richard Bracken.  Richard Bracken who kept recommending the firing of Black African American; and would receive the Stamp of Approval to proceed in such manner by the Owner of the Company, Mark Stevenson and the President of the Company, Stephen Haines

### New iMessage

To: Jennifer Slayton

I don't know why, we'll I get why Richard wants him gone. He wants everyone to go back to ignoring that he does nothing.

To: Jennifer Slayton

I can't handle all these menopausal women in here and Rick's goofy ease dropping self too

He is so scared somebody is discussing a problem he needs to mess up twice as bad.

### New iMessage

To: Jennifer Slayton

Maybe he's nervous, they are finding a lot of stuff and Stephen is now stupid he sees he is pushing it off on us to fix.

To: Jennifer Slayton

Of course this is the same thing that we were talking about

You do what he tells you to do and get in trouble for it anyway it's like you need a recorder every time he tells you something

These text messages are from the Purchasing Assistant, **Shirley Hovey**, acknowledging that she witnessed the unfair treatment on Ms. Gitau. She also acknowledges the inequality in Pay increases.

**New iMessage**

To: Shirley Hovey

I was thinking about how unfair it all is for you especially!  You make a mistake and it's called out harshly while she just gets excuse after excuse.  Nothing is ever said to her.

**New iMessage**

To: Shirley Hovey

Fran told Alie today that Richard said he had to go out this morning because he didn't want to deal with the lady from Jackson.....

Isn't that his job?

To. Shirley Hovey

What percentage? Mine was 1%

Yeah,  it's not fair. I got a little more than you but Mark had promised me that I would get a bump when the system was up and running.

**New iMessage**

To: Shirley Hovey

OMG!! He really shouldn't have a job here!  I was thinking the other day when M asked R for some report.  R said no not yet.  I was like, I've never heard him say, yes, it's right here or yes, I sent it to you yesterday.  It's always not yet, no.  Seems like Mark would get tired of that!!!!

**Ashli Duggar** held the position of Office Manager.  Her text messages to Ms. Gitau demonstrates that she was also fully aware of the company's shenanigans.  Ashli, a Caucasian clearly texted about the inequality within Little River Capital / Discover Artisan and their choice to turn a blind eye.  The series of text messages show that the Office Manager was fully aware of the incompetence of the Controller, Richard Bracken.

**New iMessage**

To: Ashli

Honestly Karen I think he's trying to get rid of you so you may want to make two lists and what I should say to him when I hand them to him is if you're going to use this against her then I'm not gonna give it to you if you're going to use this to try to fire her then I'm not gonna give it to you because that's just wrong and I'm not going to be put in the middle of that so if that is your intent then you can forget it you're not going to get it for me. What fo you think about that

**New iMessage**

To: Ashli

Yes and he's never really define my role as taking charge and that's why I had that meeting with him in December and kind of said these things are going on I'm working Karen is working Shirley is working Alie is working and then somebody watching movies all day so how is that considered work if you're here watching a movie I tried to listen this morning to my choir music and my earphone cord was not long enough for me to be able to jump up and down I guess I need to get wireless ones so that I can just pop up and down and move in and go do this and do that and do whatever because I can't sit at my desk attached to a cord and listen like that so I don't honestly know how she can watch tv and be productive.

**New iMessage**            Cancel

To: Ashli

Dec 20 2019, 12:45 PM

Richard paid Cammy and Brian for 16 closings for 4th qtr a d we only had 10. I think he paid them for sept 2 times... 😂 he's an idiot

New iMessage

To: Ashli

I also told Richard yet we're not
having closings we're not making
any sales we don't have any extra
money to be spending on overtime
for her to keep shit at home when
there's plenty a time here when we
can bounce around to each other
and do stuff. Use your fucking head
man you're a fucking idiot. That
sounds ugly and vulgar and I'm
sorry Karen he's an idiot we know
that but he's dumber than a box of
rocks I don't understand what Mrk
sees in him at all ever

New iMessage          Cancel

To: Ashli

Oh wise one who knows nothing is
the reason the numbers were low

He put health insurance credit in for
bonus week. It was his fault all along

Idiot nut

New iMessage          Cancel

To: Ashli

I just heard mark
Ask Ricky if cash was ok. And he
said yes for now. But we are short
today... I'm thinking ask Karen who
knows the truth not Ricky who
doesn't know squat

New iMessage          Cancel

To: Ashli

I'm sorry he's always working
against you and me

I hate that. No support from him
just more work

New iMessage          Cancel

To: Ashli

I talked to Ricky about the money he
overpaid. And he said yeah. His
mistake. But he talked to them
already and said we will just not pay
them for 6 closings

New iMessage          Cancel

To: Ashli

Yes for Brian that 3k more than it
should have been. And Cammy
4500 more

The text below from **Ashli Duggar**, who held the position of Office Manager shows that the Controller, Richard Bracken referred to Ms Gitau as having no brains.  Also included are messages showing the Controller turned a blind eye on the Accounts Payable Clerk and the Receptionist as they openly carried on with non-work related things in the Workplace

**New iMessage**          Cancel

To: Ashli

I think mark wants you there
because he knows you will
understand it better than Ricky

Well, I have no brains

Ricky said that not mark

_____

**New iMessage**          Cancel

To: Ashli

She has time to watch movies and
talk at length to him and Fran but
not get her work right... it's beyond
wrong... it's pitiful that he's relying
on her to be the brains

Nov 9, 2015  6:07 PM

**New iMessage**          Cancel

To: Ashli

I'm not sure Fran will be much better
cause she can't leave her phone
alone long enough to do anything

It's beyond me how no one sees
what she doesn't do... I'm
flabbergasted at how little she does
each day and still gets overtime
most weeks

**New iMessage**          Cancel

To: Ashli

I would tell Ricky you arent going to
help Her out again. Fran needs to be
trained and she can pick up jens
slack. Fran does nothing all day but
stay on her damn phone

Every time I look up there she's
swiping her screen or texting. She
does nothing but answer a call or
two a day

**New iMessage**          Cancel

To: Ashli

Just heard mark say to Richard well I
can't follow your logic but keep
going and let's see what you get.

**New iMessage**     Cancel

To: Ashli

We hire people who have been in prison out in nwalk but I can't get ahead in this damn place.. I gotta go and soon before I lose my 🤬

**New iMessage**     Cancel

To: Ashli

Jenn watches movies and gets overtime working at home.  Fran is constantly on her phone texting. I'm over all of it.

The text message below confirms that the Controller was fired from his position for the same issues that he falsified about the last 3 Senior Accountants.  We do not believe it is a coincidence that Mr. Bracken was fired 5 days after the Plaintiff informed her lawyer and Mr. Stevenson, via email shown below, that she was considering speaking publicly about what she endured during her tenure with the company.

## New iMessage

To: Ashli

Thu, Jun 18, 10:44 AM

Hey Karen!  Long time not talk to you but I just had to give you some good news!!!
Shirley just texted me and Tiffany saying that Ricky has been fired!!! For none less than "competency"!  I know this doesn't bring too much excitement for you now but I

On Sat, Jun 13, 2020, 5:49 PM Karen Gitau <karengitau315@gmail.com> wrote:

Hello,

I have been invited to speak on my experience with discrimination in the work place at a BLM meeting in Atlanta on Wednesday.

Out of courtesy, I have copied my previous employer in this email.

Thank you,
Karen Gitau

**Freedom Life Insurance Company of America**
300 Burnett Street
Suite 200
Fort Worth, Texas 76102
1-800-387-9027

INVOICE DATE        12/02/2019

MONTHLY

<div style="border:1px solid">

## IMPORTANT - FINAL PREMIUM NOTICE

</div>

LITTLE RIVER CAPITAL - MARK STEVENSON
635 GOLDPOINT TRCE
WOODSTOCK        GA   30189-0000

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|-----------|--------------|---------------|----------|------------|
| 52M614281B | KAREN N GITAU | HEALTH | 12/01/2019 | 401.29 |
| 52M614281C | KAREN N GITAU | HEALTH | 12/01/2019 | 26.89 |
| 52M614281D | KAREN N GITAU | HEALTH | 12/01/2019 | 24.33 |
| 52M614281G | KAREN N GITAU | TERM | 12/01/2019 | 29.71 |

TOTAL DUE        482.22

Don't risk losing your valuable coverage. Just a reminder, we must receive your payment within 31 days of the above due date to continue this coverage. If payment has been made, please disregard this notice.

We appreciate your continued business. If you have any question regarding this invoice, claims, or service, please call 1-800-387-9027. Please visit our web site www.flica-ins.com.

(Prnbi 1)

## PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|-----------|--------------|---------------|----------|------------|
| 52M614281B | KAREN N GITAU | HEALTH | 12/01/2019 | 401.29 |
| 52M614281C | KAREN N GITAU | HEALTH | 12/01/2019 | 26.89 |
| 52M614281D | KAREN N GITAU | HEALTH | 12/01/2019 | 24.33 |
| 52M614281G | KAREN N GITAU | TERM | 12/01/2019 | 29.71 |

TOTAL DUE        482.22

Please make check payable to:
FREEDOM LIFE INSURANCE
COMPANY OF AMERICA
Please allow 5 days for mailing

☐ Please indicate any address corrections on reverse side

2220052004012952M614281B0002689S2M614281C0002433S2M614281D0002971S2M614281G

**Freedom Life Insurance Company of America**
300 Burnett Street
Suite 200
Fort Worth, Texas 76102
1-800-387-9027

INVOICE DATE:        12/02/2019

MONTHLY

## IMPORTANT - FINAL PREMIUM NOTICE

LITTLE RIVER CAPITAL - MARK STEVENSON
635 GOLDPOINT TRCE
WOODSTOCK            GA   30189-0000

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 52M614281H | KAREN N GITAU | HEALTH | 12/01/2019 | 56.11 |

|  |  |  | TOTAL DUE | 56.11 |

Don't risk losing your valuable coverage. Just a reminder, we must receive your payment within 31 days of the above due date to continue this coverage. If payment has been made, please disregard this notice.

We appreciate your continued business. If you have any question regarding this invoice, claims, or service, please call **1-800-387-9027. Please visit our web site www.flica-ins.com.**

(Prob11)

### PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 52M614281H | KAREN N GITAU | HEALTH | 12/01/2019 | 56.11 |

|  |  |  | TOTAL DUE | 56.11 |

☐ **Please indicate any address corrections on reverse side**

Please make check payable to:
FREEDOM LIFE INSURANCE
COMPANY OF AMERICA
Please allow 5 days for mailing

611005200056115 2M614281H000000000000000000000000000000000000000000000000000000000000

**AMERICAN INDEPENDENT BUSINESS COALITION**
Administered by USHEALTH Administrators, Inc.
1819 Clarkson Rd., Suite 301
Chesterfield, Missouri 63017
1 (800) 606-3898

INVOICE DATE: 12/02/2019

MONTHLY

## IMPORTANT - FINAL NOTICE

LITTLE RIVER CAPITAL - MARK STEVENSON
635 GOLDPOINT TRCE
WOODSTOCK          GA  30189-0000

| MEMBER NUMBER | PRIMARY MEMBER | | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 72C661206S | KAREN N GITAU | ASSOCIATION DUES | 12/01/2019 | 62.95 |

| | TOTAL DUE | 62.95 |
|---|---|---|

We should receive your payment by the due date noted above. Any delay in remitting your payment may jeopardize your coverage. Thank you for your continued business. If you have any questions regarding this invoice, claims, or service, please call     1-800-606-3898.

(ciabl1)

### PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 72C661206S | KAREN N GITAU | HEALTH | 12/01/2019 | 62.95 |

| | | TOTAL DUE | 62.95 |
|---|---|---|---|

☐ **Please indicate any address corrections on reverse side**

Please make check payable to:

**AMERICAN INDEPENDENT BUSINESS COALITION**

Please allow 5 days for mailing

!950072000629572C661206S000000000000000000000000000000000000000000000000000000000

(CIABL1)

**AMERICAN INDEPENDENT BUSINESS COALITION**
**Administered by USHEALTH Administrators, Inc.**

1819 Clarkson Rd., Suite 301
Chesterfield, Missouri 63017
1 (800) 606-3898

INVOICE DATE:     11/25/2019

MONTHLY

## MEMBERSHIP DUES NOTICE

LITTLE RIVER CAPITAL - MARK STEVENSON
635 GOLDPOINT TRCE
WOODSTOCK        GA   30189-0000

| MEMBER NUMBER | PRIMARY MEMBER | | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 72C661206S | KAREN N GITAU | ASSOCIATION DUES | 12/01/2019 | 62.95 |

TOTAL DUE      62.95

We should receive your payment by the due date noted above. Any delay in remitting your payment may jeopardize your coverage. Thank you for your continued business. If you have any questions regarding this invoice, claims, or service, please cal     **1-800-606-3898.**

(CIABIl)

### PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

| ID NUMBER | INSURED NAME | COVERAGE TYPE | DUE DATE | AMOUNT DUE |
|---|---|---|---|---|
| 72C661206S | KAREN N GITAU | HEALTH | 12/01/2019 | 62.95 |

TOTAL DUE      62.95

☐ **Please indicate any address corrections on reverse side**

Please make check payable to:
AMERICAN INDEPENDENT BUSINESS COALITION

Please allow 5 days for mailing

I629500720006295 72C661206S00000000000000000000000000000000000000000000000000000000000

(CIABIl)



## DECLARATION OF STEPHEN HAINES

1. My name is Stephen Haines. I am over the age of 18, suffer no legal disabilities, and state the following facts voluntarily based upon my personal knowledge. I give this declaration for use in any proceeding in connection with Karen Gitau's employment with Little River Capital LLC.

2. In or around May 2019, I was hired by Mark Stevenson, owner of Little River, as a consultant to evaluate the company and its employees. I first met Karen Gitau during that process. It was my understanding that Mr. Stevenson had encouraged all employees to be open and honest in their interviews with me.

3. My impression of Ms. Gitau was not favorable. I was surprised that she seemed to lack knowledge of some basic accounting functions. For example, she stated that she "couldn't figure out the balance sheet," as reflected in my notes.

4. In addition to her apparent lack of accounting knowledge, I was concerned that Ms. Gitau had so many unfavorable things to say about her co-workers, as well as her supervisor. She seemed to have a poor opinion of many other employees, in terms of skill and disposition.

## EXHIBIT E

Summary of Tape Recordings of meeting between Mr. Bracken and Ms. Gitau

With Richard Bracken being the person in charge of company affairs, the rest of the employees were left with no choice but to watch in silence when he either talked in condescending tones to me; mocked me or make fun especially because I was foreign born.

In the first part of the recording attached, you will hear me tell Richard Bracken that I felt that he discriminated against me. I also mention that all the ladies in the office have, at different times, come to me and informed me of the same. His response each time, was evasive. You will also note that he is calm and not all up in arms about not being discriminative. I also mentioned to him that I noticed the same treatment being done to Tiffany Warren (a former Senior Accountant) and he avoided answering the question because Tiffany and I shared an office thus I was a witness to what he did to her. Richard Bracken portrayed Kim Harold as being an excellent employee yet he released her. At the time of this recording, I had never met or spoken with Kim Harold. When I eventually got to speak with her, her account of what happened is totally contradictory to what Richard Bracken stated. In this recording, you will see that he did not want to discuss Tiffany Warren because I was witness to what he did to her.

In the second part of the recording, Richard Bracken is upset that I drafted an Employee Handbook. This was something that he was tasked by Mark Stevenson to do over 2 years ago. Mark Stevenson was pleased that a draft version had been created. In the recording, Richard Bracken states that it seems like I want to do more Administrative work because I drafted a Handbook; and because I opened Company Fedex, UPS, USPS accounts.

When our Office Manager, Ashli Duggar gave her two-week notice, I was told by Richard Bracken to train with her. She gave her notice Feb 4th and left on Feb 15th. While I was learning her busy desk, I was also required to perform the company's tedious month-end close of the books. When Ashli Duggar left, the company did not hire a replacement. I was required to do both my full time Senior Accountant tasks and her duties. In the recording, I mention that I worked on creating the Employee Handbook during off hours at home. Every company needs an Employee Handbook!! Richard was upset because the handbook contained topics such as Discrimination and Retaliation. The following day, he told me that he is taking over revising and making the Handbook a final copy. As of the date being released from Little River Capital, 6 months later, there is no Handbook; and the copy that I presented to him was thrown in the trash can.

Other Occurrences:

1) Mark Stevenson and Richard Bracken were observed recording or taking pictures of my rear part of the body. The employee, who pleads to remain anonymous as she still employed with Little River Capital, indicated that though she did not see what was on their screens, she was basing her assumptions off the way they held and aimed their phones which was standard with anyone using a phone to record something.  After being made aware of this, I started paying attention and noticed a pattern: We have only one bathroom in the office. My office was located near the front of the office and in order to get to the bathroom which was at the back, I had to pass everyone's office. On my way back to my office, I would notice on several occasions that both Mark and Richard standing by their office doors with their phones. As soon as I would pass

them, I would quickly look back and notice that their phones are positioned to capture my buttocks region.

2) One day, as I walked up to the microwave to warm my lunch, Mark Stevenson immediately walked out of his office which is near the microwave area and proceeded to run his hand up and down my back. I was facing the microwave and did not see or hear him approach me. I was startled and quickly raised my hands up in defense as I turned around and he hurriedly walked back to his office. The act of a guilty man. If it was an innocent act, he would have stayed around and apologized.

I have brought it to Mark Stevenson and Richard Bracken's attention that I grew being child molested from the age of 6 and raped in my birth country, Kenya. I told them this secret hoping that they would start seeing me as a person and respect me like they did to the other ladies in the workplace. This did not change the two men. Richard Bracken had the audacity to come to me and state **"I do not want to hear that personal side of you ever again"**

**Why did I continue to work for Little River Capital for over 2 years?**

I am a single mother to a wonderful and intelligent 12 year old boy. When I got the job at Little River Capital, I applied for "School of Choice" to Frey Elementary School in Acworth, Ga. He was accepted into the school and it now in Durham Middle School (the top Middle school in Acworth). While working at Little River Capital in Dallas, Ga, I was able to drop off and pick up my son from school as it was on my way to work. I worked from the moment I entered the office until it was my time to leave. Everyday, I ate at my desk as I worked. I did not take the one hour lunch break like everyone else so that I could stay caught up on my work. Now as I look for another job opportunity, I am fully aware that it may involve either pulling my son out of the school that he is currently in and is exceling (he made Honor Roll) and totally loves! Chances of me getting a job opportunity which will allow me to drive from Kennesaw to Acworth and then to the job almost rare.

**From:** Karen Gitau <karengitau315@gmail.com>
**Sent:** Sunday, November 24, 2019 2:51 PM
**To:** Lori.nickson@spielbergerlawgroup.com
**Subject:** CLID: 1911213692, Gitau, Karen

Below is Ashli Duggar's statement.
Ashli worked on accounting month-end close for 3 subdivisions that were located in Villa Rica Ga. She first trained with Richard Bracken in December 2016 on how to close the books. In her statement below, she indicates that every month for one year, Richard Bracken sat with her for 3-4 days to help with the closing of the books. Please note that the same process was used to close all subdivisions. If he demonstrated Tiffany Warren and I as incapable of performing our duties, why didn't he sit with us for a year like he did Ashli? Yet he gave her raving annual reviews. After Tiffany Warren was fired, I was brought on full-time as the Senior Accountant (i previously held part-time Accounts Payable position from May 2017 - Nov 2017). I started as a the Senior Accountant in November 2017. In December 2017, Mark Stevenson and Richard Bracken decided I would also take on the Financial aspect of the business - where I was tasked to created a Financial model to capture homes constructed and sold since 2012 (the start of business) then budget and forecast for homes through 2026; By February 2017, Richard Bracken told me that he was taking Ashli off month-end close and that I should take on her subdivisions. These were 3 jobs rolled into one person (I was Sr Accountant for my assigned duties; Financial Analyst for all subdivisions and then Sr Accountant to Ashli's subdivisions). I worked days, nights and weekends. Ashli then focused on Brokerage and Office Manager duties until February 4th 2019 when she gave her resignation and I was called upon to train with her and take over her desk. Please note that during this time, I was in the process of closing the books while learning her desk (I burned the midnight oil to stay caught up). Please note also, that nobody else in the office was called upon to help me. Before Ashli Duggar resigned, she used to work closely with the receptionist who handled filing; making copies etc. On February 18th 2019, which was the Monday following Ashli's last day, the receptionist came to me and told me to do my own filing and every task that she used to perform for Ashli. Mark Stevenson and Richard Bracken were having a conversation near my office at that time - they stopped talking and glanced at the receptionist and then carried on with their conversation. And just as the receptionist stated, she did not help me in any way going forward.
If i was just a terrible worker, why was so much work piled on me? Why was I the only one being asked to train with others? There were 7 other ladies working in the office - they were never given additional tasks!! Yet I was the one getting 2% annual raise in 2018 and 1% raise in 2019 for poor performance while the rest enjoyed 5% raises.

--------- Forwarded message ---------
**From:** Ashli Duggar <alduggar@gmail.com>
**Date:** Sun, Nov 24, 2019 at 2:07 PM
**Subject:**
**To:** <karengitau315@gmail.com>

Karen, here is my account of month end's with Richard. In Dec of 2016 he started explaining the process of the month end close to me and said that in January 2017 I would be helping Tiffany with month end close.I would be responsible for Meriwether and other subdivisions other than Naturewalk and Artisan. Every month for a year he sat with me for 3-4 days for the month end process to help me with the closing process of the homes that were sold. There were no months that were ever alike or that I could go to the previous month's work to use as a guide to complete the process. It was very frustrating

to have to do this with him each month for this length of time. Had the process been explained better or a better process been in place, I feel that I would have been better suited to complete the month end tasks on my own.

I experienced many occasions where he was unprofessional towards Karen while she was working at Little River Capital, LLC. He would come to me and ask me if I knew why she was making mistakes in her work. I told him it was probably because he was very unprofessional towards her, was unkind to her and that he pushed her in her daily work. He treated her differently than anyone else in the office. Karen found many mistakes in the work she received from Richard and that caused her to have to stop and fix his mistakes before she could go on to complete her own work.
At one time, Richard came to me and asked me to take Karen to lunch to find out what he was doing to her that made her make mistakes and to let him know what he needed to fix. I agreed to take her to lunch but I told him then that I didn't feel like he was treating Karen fairly and that he put too much undue pressure on her. He would always point out anything she didn't do his way as being wrong. All in all, it was very evident that he treated her differently than all the others in the office. Karen worked very hard and was always came to work and did the best of her ability in all of her tasks.
Thank you.
Ashli

--

Thanks!
Karen Gitau
404 414 7244

**AGREEMENT AND COMPLETE RELEASE**

This Agreement and Complete Release is entered into by Karen Gitau, a Georgia resident ("Employee"), and Little River Capital, LLC, d/b/a Artisan Built Communities a Georgia Limited Liability Company, and Affiliates ("Company" or "Broker") (hereinafter as of the date set forth below ("Agreement").

WHEREAS, Employee was engaged as a Team Member for the purpose of acting as an employee for Little River Capital, LLC, d/b/a Artisan Built Communities, its, successors and assigns ("Company") and has executed certain agreements including an Offer Letter

WHEREAS, Employee has not assigned any rights, privileges, contractual rights of the Hiring Agreements (as defined herein), choses in action, against the Company; and

WHEREAS, Employee acted as a "Team member" for the Company; and.

WHEREAS, Employee performed services on behalf of the Company and its subsidiaries regarding the services offered by the Company;

WHEREAS, Employee was engaged by the Company on or about May 13, 2017, and the Company later terminated her employment for cause on or about November 12, 2019 ("Engagement"); and

WHEREAS, Employee and the Company desire to enter into this Agreement and Release; and

WHEREAS, the Effective Date of this Agreement shall be on the eighth (8") day following Employee's execution of this Agreement ("Effective Date");

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, each of the undersigned parties hereto hereby acknowledge and agree as follows:

1. Payment Release; Termination. For valuable consideration of two week pay and accrued 2019 annual bonus in the amounts of $2,353.85 and $4,768.50, respectively ("Separation/Severance Payment ) and all terms and conditions, warranties, representations and covenants set forth herein, Employee does for herself, heirs, executors, legal representatives and assigns, successors and assigns, anyone claiming by or through her/it, forever unconditionally and irrevocably releases, acquits, and discharges Company, its parent, subsidiaries, Affiliates and their officers, shareholders, members, managers, board members, agents and attorneys, ("Released Parties") from any and all Claims and causes of action, suits, obligations, promises, agreements, controversies, damages, debts and demands, liabilities and losses of every kind, character, and nature including third party claims for indemnity or contribution, under any federal or state statute and common law, including, but not limited to, 42 U.S.C. §1981; Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991; the Americans with Disabilities Act; the Age Discrimination in Employment Act ("ADEA"); The Older Workers Benefit Protection Act(OWBPA); The Georgia Fair Employment Practices Act; the Employee Retirement Income Security Act of 1974; The Fair Labor Standards Act, as amended; any statute administered by the Georgia Commission on Equal Opportunity, against Company and any other cause of action ("Claim" or "Claims") (as defined below) that Employee has ever had or now has, known or unknown, or that any person or entity claiming through any party may have or claim to have against the Company or its Releases arising out of or related to the Hiring Agreements or Engagement. The Separation/Severance Payment shall be made payable to "Karen Gitau".

1.2 ADEA Release. Employee hereby acknowledges that she knowingly and voluntarily enters into this Agreement with the purpose of waiving and releasing any claims under the Age Discrimination in Employment Act of 1967 and the Older Workers Benefit Protection Act (OWBPA), and as such, she acknowledges and agrees that:

1. this Agreement is worded in an understandable way;
2. any rights or claims arising under the ADEA and OWBPA are waived;
3. claims under the ADEA and OWBPA that may arise after the date of this Agreement are not waived;
4. the rights and claims waived in this Agreement are in exchange for additional consideration over and above

anything to which Employee was already undisputedly entitled;

5. Employee has been advised in writing to consult with an attorney prior to executing this Agreement, and has had an opportunity to do so;

6. Employee has been given a period of time, twenty-one (21) days, if desired, to consider this Agreement, and understands that she may revoke her waiver and release of any ADEA (age discrimination) or OWBPA claims covered by this Agreement in the seven day period following her execution of this Agreement; provided however, that such a revocation will be deemed to cause a failure of consideration for this Agreement, whereupon Company would be entitled to a return of any monies paid to Employee under this Agreement; and

7. Any changes made to this agreement, whether material or immaterial, will not restart the running of this twenty-one (21) day period.

8. Attached to this Agreement and Release of claims is information required under the Older Workers' Benefit Protection Act as to eligibility for the severance program including the class of employees covered, time limits for participation, job titles and ages of eligible employees and job titles and ages of employees who are not eligible for the severance program.

9. Employee hereby acknowledges and agrees that Employee is not entitled to, nor shall Employee seek to obtain any funds, compensation, payments or distributions from the Company other than as stated in paragraphs 1 and 2 herein.

10. Employee hereby acknowledges and agrees that Employee is not a member, economic interest holder, unvested or vested profits units holder to the Company.

__terms and conditions.__ Employee agrees warrants and represents Employee agrees to and accepts the ...s and to whom such payments were made as set forth within paragraph.

2.1 Employee hereby represents and warrants that she has not assigned or otherwise transferred to any other person or entity any interest in any claim, demand, action and/or cause of action she has, or may have, or may claim to have against any Released Party. Employee agrees to indemnify and hold harmless all of the Released Parties from any and all injuries, harm, damages, suits, assessments, costs, losses, expenses and/or liability, including reasonable attorneys' fees and court costs, incurred as a result of any claims or demands which may hereafter be asserted against any such Released Parties by, through, or by virtue of an assignment or other transfer by Employee.

2.2 Other Benefits and Reimbursement. Employee acknowledges and agrees that Employee has been reimbursed and paid for reasonable business expenses incurred by Employee. Any benefits under the Covenants Agreement or the employment not specifically addressed in this Agreement and Release to continue beyond the Last Day shall cease on the Last Day unless provided otherwise in the law. Employee warrants and represents that all expenses reports and reimbursable expenses and costs submitted to the Company for payment are true, accurate and legitimate business expenses incurred in the ordinary course of Employee's duties on behalf of the Company. As used herein, the term "Obligation" refers to any contracts, debts, or monetary obligation that Employee incurred on behalf of the Company while Employee was employed by the Company. Employee hereby represents and warrants to Company that she has accurately and fully listed on the schedule attached hereto as Exhibit A all such Obligations that be incurred on behalf of the Company while she was engaged by the Company. Employee further agrees to indemnify and hold Company harmless from any demands, suits, damages (including costs and fees) that the Company may hereafter incur or suffer on account of any Obligations that are not listed and disclosed in said schedule attached as Exhibit A. Employee further warrants and represents to the Company that he has not breached any fiduciary duties or taken any intentional acts which would injure the Company while he was providing services and during the term of the Engagement other than as listed on said schedule attached as Exhibit B. Employee's representations and warranties to the Company shall survive a breach of this Agreement.

Employee has no sole actual knowledge.

Further, Employee shall cooperate with the Company to finalize, investigate or update any matters to which Employee has knowledge. Company shall cooperate with Employee to finalize, investigate or update any matters to which proceedings relating to any matters with which Employee was involved during Employee's employment with or practices. In addition, Employee agrees to cooperate with Company in any litigation or administrative of the Company or any of its officers, members, managers, agents, representatives, products or services, standpoint, derogatory, or defamatory, or which may reasonably intend to injure the reputation or business of the Company or any of its officers, members, managers, agents, representatives, products or services. Indirectly, any oral or written statement about Company or any of its respective officers, members, managers, employees, agents, representatives, products or services, or practices that may be considered disparaging, administrative process. At all times, Employee shall refrain from publishing, providing, or otherwise, directly or advice. Employee shall not limit the Parties' ability to provide truthful testimony as required by any judicial or covenant shall not limit the Parties' ability to provide truthful testimony as required by any judicial or or affiliates, managers, agents, employees, officers, directors, successors or assigns, attorneys, provided that remarks disparaging the conduct or character of the other, including but not limited, to their parent, subsidiary

**4.2 Non-Disparagement and Cooperation.** The Parties to this Agreement and Release agree not to make any
violate any of the terms of this Agreement.

testimony so that the other Party will have the opportunity to object to any such testimony that would otherwise other Party within a reasonable time after becoming aware of such circumstances and prior to giving such Agreement, by subpoena or other legally enforceable means, prompt notice shall be given by such Party to the concerning the confidential Settlement in other legal proceedings, or any of the matters referred to in this disclosures are made by them), except as required or ordered by court of court. If the Parties are compelled to testify be made aware of the provisions of this paragraph and must agree to be bound by them prior to such time as advice, provided that any such non-privileged person or entity providing information about this Agreement is shareholders, health care professionals, tax advisers or other advisers that the Parties consult for professional there from, and including any claims known or unknown to the Parties (other than attorneys, counselors, including, but not limited to, this Agreement, and Employee's Engagement by the Company and all other disputes arising indebtedness or claim unknown or relating to any and all sources, things and/or whatsoever.
disclosed by Employee, its agents, employees, and attorneys to anyone whatsoever in any fact, issue, resolved. The Parties also acknowledge and declare that the Settlement is to be kept confidential and shall not be otherwise provided in this paragraph. The Parties may state to their current employer, that all claims have been nor shall this Agreement be admissible in any proceeding, whether judicial, administrative, or otherwise, except as to the extent necessary to enforce the terms of this Agreement. In the event of a breach of this Agreement, as (the "Confidential Settlement") shall be kept confidential and not be disclosed by Employee to any third party, of this Agreement, all terms, provisions, covenants, representations, conditions and content of this Agreement

**4.1 Confidentiality.** The Parties hereby agree that obligations or otherwise provided by this Agreement, the obligations

## Confidentiality and Non-Disparagement.

rights that Employee may have in any retirement plan or COBRA.

**3.1** Not Waive Certain Rights. This Agreement shall not embrace, alter, or otherwise interfere with any vested

Claims shall be derived at any demand, adjustment, settlement, losses, claims, lawsuit, and damages made by any third party, and the defense of any action based on any such act or omission, which attorneys' fees may be incurred, business, including costs and reasonable attorneys' fees incurred by the Company or its officers in connection by reason of any act performed or omitted to be performed by Employee in connection with the Company's and pay all judgment and claims against the Company or its officers relating to any liability or damage incurred Agreements, Engagement and any Claims against the Released Party. Employee shall indemnify, save harmless, under, or legal proceeding or administrative, during, for or arising out of or relating to the hiring.

**(ii)** Employee will not, whether directly or indirectly, or through third parties, file any lawsuit, cause of action claim, Claims (as defined hereby) released or waived under the release paragraph below.

**(i)** Employee will not file any administrative action, sue the Released Party (as defined herein) on the basis of any accusations and agree. Covenants, promises and agrees to the same extent, except to the extent waived, or released

4.3 Liquidated Damages. The Parties acknowledge and agree that a breach of paragraphs 4.1 and 4.2 would result in damages to the Company and it would be difficult or impossible to determine damages that would be caused by Employee if such contemplated breach or breach were to occur, and the amount of the liquidated damages stated herein is a reasonable estimate of the actual damages that the Company would suffer if there were a breach by Employee of this provision. The Parties also acknowledge and agree if Employee breached the provisions of this paragraph 4, it would be difficult to determine actual damages suffered by the Company, and further, based on the information presently known by the Parties (including but not limited to, that Employee was an employee of the Leadership Team, and is known in the residential real estate business in the areas where the Company currently conducts Business, that Employee knows and has contact with licensees and other employees previously or currently engaged by the Company, and Employee comes into contact with not only other potential employees and licensees who could be engaged or are engaged or employed by Company, yet also has potential contact and current contact with customers and/or clients, individuals or companies seeking to sell or buy residential real property in the metropolitan Atlanta area, that Employee had direct contact with leadership and executive team members and individuals engaged by the Company, and that Company is growing its business in the Atlanta metropolitan area and elsewhere, that Company currently hired a number of licensees and employees for its business and plans to expand hiring as growth of the Company continues, that Company has developed a corporate culture of good standing and reputation in its industry, that Company regularly engages in marketing and public and social media advertising for advancement of its business, and thereby, the Parties agree that Two Thousand dollars ($2,000.00) per Occurrence (as defined herein):

(i) is a reasonable estimate of the damages that would accrue if a breach occurred by Employee in the future,

(ii) acknowledge and agree that the amount of liquidated damages is fair and reasonable,

(iii) that such amount is a reasonable pre-estimate of the probable loss to Company,

(iv) and would not act as a penalty to the breaching party under any applicable law.

"Occurrence" shall be defined as:

(i) any disclosure by Employee, her/its agents, employees and attorneys, Engagement and Hiring Agreements, as more specifically set forth in this paragraphs 4.1;

(ii) any disclosure by Employee, her/its agents, employees and attorneys of the obligations of Employee as set forth in 4.2;

(iii) any disclosure by Employee her/its agents, employees and attorneys of the existence of and the Confidential Settlement as defined herein,

(iv) Employee's breach of paragraph 4.1;

(v) Employee's breach of paragraph 4.2.

4.4 Action Taken. Notwithstanding a breach by Employee of this paragraph, and any enforcement of the provision set forth herein, such breach or any action taken by Company will not relieve Employee of the obligations under paragraphs 4.1, 4.2 and 8 and any other provisions or agreements to which Employee is bound.

4.5 Severability. If any provision, or portion thereof, of paragraphs 4 and 8 are, or becomes, invalid under any applicable statute or rule of law, it is to be deemed stricken and the rest of the paragraphs shall remain in full force and effect.

No Admission. It is expressly understood and agreed that there is no admission of any liability whatsoever any of the Parties to any claim a Party has or may have, against the other Party with regard to any fact, issue, ebtedness or claim arising out of or relating to any and all sources, things and/or matters whatsoever, including, but limited to, the Agreements and the Engagement and all other disputes arising therefrom, and including any claims wn or unknown to the Parties, other than that which may be set forth in this Agreement. Payment of any funds and/or duct by the Parties in compliance with the Agreement shall not act as an acknowledgment of any liability by any Party ny other Party as to the claims and assertions by each Party above or otherwise, such liability being strictly denied. It is lerstood by the Parties that this Agreement is the compromise of any disputed claims, and that the actions taken uant to this Agreement are not to be construed as an admission of liability, malfeasance, misfeasance, or breach of duty to act, implied or by agreement, on the part of any of the Parties. The Parties enter into this Agreement solely for purpose of avoiding further cost, expense and inconvenience.

6. Survival. The terms of Paragraphs 1,4,5,7, 8and 9, shall survive any breach of this Agreement. The representations and warranties contained herein shall not be extinguished upon execution hereof, but shall survive the execution and may be asserted without limitation, except as otherwise provided herein or by law.

7. Return of Company Property. Employee warrants and represents that Employee has returned all Company property including Confidential information to Company.

8. Non-Solicitation of Contractors/Licensees/Employees. For a period of two (2) years after Employee's Termination, irrespective of the reason for such Termination, Employee will not, without the prior written consent of Owner, directly or indirectly on Employee's own behalf or in the service or on behalf of others, solicit, divert, or recruit any employee, contractor or agent or assist others to solicit, divert or recruit of Broker to leave such employment, whether such employment is by written contract or at will.

Parties Agreed and Accepted

Karen Gibbs

Richard Bradley
Controller, Artisan Built Communities
Little River Capital, LLC

**SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

ID# 2021-0007054-CV
🏛 EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
**21100427**
Kimberly A. Childs - 58
JAN 19, 2021 12:20 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

CIVIL ACTION NUMBER  21100427

$214.00 COST PAID

Gitau, Karen

_____
**PLAINTIFF**

**VS.**

Little River Capital, DBA Mark Stevenson

_____
**DEFENDANT**

**SUMMONS**

TO: LITTLE RIVER CAPITAL

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Gitau Karen**

**4629 ODESSA WEST CT NW**
**ACWORTH, Georgia 30101**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If this action pertains to a Protective Order, the Answer is to be filed and served on or before the scheduled hearing date attached. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 19th day of January, 2021.**

Clerk of Superior Court

_____
Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

ID# 2021-0007056-CV
**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**21100427**

**Kimberly A. Childs - 58**
**JAN 19, 2021 12:20 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

## DISCLOSURE STATEMENT
## CLERK OF SUPERIOR COURT

**CASE NUMBER** **21100427**

Gitau, Karen
_____
                    Plaintiff

                    Vs.

Little River Capital
_____
                    Defendant

### TYPE OF ACTION

- o Divorce without Agreement Attached
- o Divorce with Agreement Attached
- o Domestic Relations
- o Damages Arising out of Contract
- o Damages Arising out of Tort
- o Condemnation
- o Equity
- o Zoning – County Ordinance Violations (i.e., Injunctive Relief-Zoning)
- o Zoning Appeals (denovo)
- o Appeal, Including denovo appeal – excluding Zoning

- o URESA
- o Name Change
- ☑ Other
- o Recusal
- o Adoption

### PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court (Whether pending simultaneously or not)?

☑  NO
o  YES – If yes, please fill out the following:

1. Case # _____

2. Parties _____

3. Assigned Judge _____

4. Is this case still pending?    o  Yes    o  No

5. Brief description of similarities:

/S/  **Karen, Gitau**
_____

## Top Return Receipt Card

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MARK STEVENSON
STEPHEN HAINES
LITTLE RIVER CAPITAL
76 SEVEN HILLS BLVD
DALLAS    GA 30132

9590 9402 5956 0062 1537 23

2. Article Number (Transfer from service label)

7020 1290 0000 1761 5021

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   RO
□ Agent
□ Addressee

B. Received by (Printed Name)     C. Date of Delivery
                                  1-6-21

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
- □ Adult Signature
- □ Adult Signature Restricted Delivery
- □ Certified Mail®
- □ Certified Mail Restricted Delivery
- □ Collect on Delivery
- □ Collect on Delivery Restricted Delivery
- □ Insured Mail
- □ Insured Mail Restricted Delivery (over $500)
- □ Priority Mail Express®
- □ Registered Mail™
- □ Registered Mail Restricted Delivery
- □ Return Receipt for Merchandise
- □ Signature Confirmation™
- □ Signature Confirmation Restricted Delivery

## Top Certified Mail Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee   $

Extra Services & Fees (check box, add fee as appropriate)
- □ Return Receipt (hardcopy)          $
- □ Return Receipt (electronic)         $
- □ Certified Mail Restricted Delivery   $
- □ Adult Signature Required             $
- □ Adult Signature Restricted Delivery  $

Postage   $

Total Postage and Fees   $

Sent To   LITTLE RIVER CAPITAL
Street and Apt. No., or PO Box No.   76 SEVEN HILLS BLVD
City, State, ZIP+4®   DALLAS    GA 30132

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

Postmark Here   JAN 6 2021
GRESHAM ROAD STA

7020 1290 0000 1761 5021

## Bottom Return Receipt Card

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

9590 9402 5956 0062 1616 81

2. Article Number (Transfer from service label)

7020 1290 0000 1762 3767

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   RR 50 C19
□ Agent
□ Addressee

B. Received by (Printed Name)     C. Date of Delivery
L41e RIVER CAPH

D. Is delivery address different from item 1?   ☑ Yes
   If YES, enter delivery address below:        □ No

LITTLE RIVER CAPITAL
76 SEVEN HILLS BLVD
STE 200 109
DALLAS    GA 30132

3. Service Type
- □ Adult Signature
- □ Adult Signature Restricted Delivery
- □ Certified Mail®
- □ Certified Mail Restricted Delivery
- □ Collect on Delivery
- □ Collect on Delivery Restricted Delivery
- □ Insured Mail
- □ Insured Mail Restricted Delivery (over $500)
- □ Priority Mail Express®
- □ Registered Mail™
- □ Registered Mail Restricted Delivery
- □ Return Receipt for Merchandise
- □ Signature Confirmation™
- □ Signature Confirmation Restricted Delivery

## Bottom Certified Mail Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee   $

Extra Services & Fees (check box, add fee as appropriate)
- □ Return Receipt (hardcopy)          $
- □ Return Receipt (electronic)         $
- □ Certified Mail Restricted Delivery   $
- □ Adult Signature Required             $
- □ Adult Signature Restricted Delivery  $

Postage   $

Total Postage and Fees   $

Sent To   LITTLE RIVER CAPITAL
Street and Apt. No., or PO Box No.   76 SEVEN HILLS BLVD STE 200
City, State, ZIP+4®   DALLAS    GA 3013

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

Postmark Here   JAN 21 2021

7020 1290 0000 1762 3767